# IN THE COURT OF APPEALS OF IOWA

No. 23-1218
Filed August 21, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**PATRICK SCULLARK,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.

A defendant appeals his convictions for possession of methamphetamine with intent to deliver and failure to affix a tax stamp. **REVERSED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Thomas J. Ogden (until withdrawal) and Timothy M. Hau, Assistant Attorneys General, for appellee.

Considered by Tabor, C.J., and Badding and Buller, JJ.

**TABOR, Chief Judge.**

"All the stuff you're handing her, I'm searching, just so you know." That's what Waterloo Police Officer Jacob Bolstad told Patrick Scullark as he handcuffed and arrested him on an assault charge. And the officer was true to his word—seizing and searching the fanny pack Scullark passed to his friend. Inside Scullark's fanny pack, police found cash and twenty-three grams of methamphetamine. Scullark moved to suppress the drugs, alleging the warrantless search of the fanny pack violated his constitutional rights. The district court denied the motion, finding a valid search incident to Scullark's arrest. Scullark now challenges that ruling.

Because Scullark had no realistic ability to access the fanny pack after he was handcuffed and escorted to the patrol car, the search did not meet the incident-to-arrest exception to the warrant requirement. Thus, we reverse the suppression ruling and remand for further proceedings.

## I. Facts and Prior Proceedings

A former girlfriend accused Scullark of throwing a watch, hitting her in the face, and causing a laceration. She alerted Officer Bolstad to the address where Scullark was moving. The officer located Scullark outside that house, talking on the phone, "pretty agitated" and "emotional." Officer Bolstad recorded their encounter on his body camera. The officer heard Scullark say he was on parole and didn't want to go back to jail. When Scullark noticed the officer approaching "he decided to bolt inside of the residence." The officer ordered Scullark to stop, but he ignored that command. So the officer followed him inside.

Scullark was crying and repeating that he didn't do anything wrong. In fact, he was so overwrought he crumpled to the floor. The officer recalled trying "to keep him calm and deescalate the situation because ultimately he was going to be going to jail for domestic assault."

When Officer Bolstad broke the news to Scullark that he was under arrest, Scullark was wearing a fanny pack around his waist. The officer estimated that it was ten by five inches—big enough to hold a small firearm or a knife. Before he was handcuffed, Scullark told the officer, "don't touch me right now" and handed the fanny pack to his friend, Tammy, who was standing nearby. Bolstad did not protest the handoff because he was the only officer present and did not want to "escalate the situation."

A few seconds later, Officer Bolstad handcuffed Scullark and informed him that the police would search the items passed to Tammy. By then, Tammy had taken three or four steps away from Scullark. The officer said: "Tammy, you stay over here with that." She then set the fanny pack down on a plastic tub next to a laundry basket just across the threshold of an adjoining room. As Scullark continued to lament—"I can't go to jail bro"—he walked toward the spot where Tammy left the fanny pack. Bolstad told him to stop and tightened the handcuffs. The officer later conceded that Scullark could not have reached the fanny pack at that point because his hands were cuffed behind his back.

The officer then picked up the fanny pack and carried it outside while escorting Scullark to the waiting patrol car. Tammy and another friend of Scullark joined them outside. By then, at least two other officers had arrived at the scene. As Officer Bolstad stood with Scullark just outside the open back door of his patrol

car, the officers searched the fanny pack. Bolstad later testified: "And while we were searching the bag, [we] located a large amount of money, an amount of drugs, and I don't really recall what else was in the bag."[1]

Based on that discovery, the State charged Scullark with possession of methamphetamine with intent to deliver, a class "B" felony, in violation of Iowa Code section 124.401(1)(b)(7) (2022) and failure to affix a drug tax stamp, a class "D" felony, in violation of section 453B.12. He moved to suppress the evidence seized by the officers, alleging a violation of his rights under the Fourth Amendment of the federal constitution and article 1, section 8 of the Iowa Constitution. The court denied his motion.

Scullark then entered a conditional guilty plea to the charged offenses, reserving his right to raise the suppression issue on appeal. The court entered judgment and sentence—from which Scullark now appeals.

## II.      Jurisdiction/Conditional Guilty Plea

Traditionally, when defendants enter a guilty plea, they waive "all defenses and challenges not intrinsic to the voluntariness of the plea." *State v. Tucker*, 959 N.W.2d 140, 146 (Iowa 2021). To some degree, that changed effective July 1, 2023. Now defendants may enter conditional guilty pleas to preserve their

---

[1] Officer Bolstad's bodycam footage shows Scullark standing by the patrol car, talking to his mother on a cell phone held by one of his friends. He complains that the police have "his wallet with all of his credit cards in it" and "two hundred dollars for his light bill." At that point, an officer hands Scullark's friend a wad of cash. Then, before placing Scullark in the backseat, Officer Bolstad asks: "Patrick, is there anything else you want them to have out of that thing?" Scullark ignores the question. So the officer tells him: "Get in the car, we're done." Scullark then tells his friend to "get the wallet." Bolstad responds: "She's not getting the wallet. We're taking all that stuff to the jail with you." It is unclear from the recording when the officers find the methamphetamine.

potential appellate challenges to adverse rulings on a pretrial motion. Iowa R. Crim. P. 2.8(2)(b)(9)[2]; Iowa Code § 814.6(3).[3] But under the statutory language, we have jurisdiction over an appeal from a conditional plea only when "appellate adjudication of the reserved issue is in the interest of justice."[4] *Id.* § 814.6(3)

At the July 20, 2023 plea hearing, the State consented to Scullark's request to enter a conditional guilty plea to reserve the right to contest the denial of his motion to suppress on appeal. The court accepted the plea and advised Scullark of his right to appeal. Now Scullark urges appellate review of his suppression issue "is in the interest of justice" under section 814.6(3). *See generally* Iowa R. App. P. 6.103(2)(a) (requiring appellant's brief, in appeal from judgment of sentence

---

[2] The rule states:

> With the consent of the court and the prosecuting attorney, a defendant may enter a conditional plea of guilty, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea.

Iowa R. Crim. P. 2.8(2)(b)(9).

[3] The statute provides:

> A conditional guilty plea that reserves an issue for appeal shall only be entered by the court with the consent of the prosecuting attorney and the defendant or the defendant's counsel. An appellate court shall have jurisdiction over only conditional guilty pleas that comply with this section and when the appellate adjudication of the reserved issue is in the interest of justice.

Iowa Code § 814.6(3).

[4] One commentator offers this insight into the cross-over between the new statute and the rule:

> Curiously, the original language of the rule as approved by the Court in 2023 stated explicitly that an approved conditional guilty plea constituted good cause to appeal the ruling on the motion, circumventing the Iowa Code § 814.5(1)(a)(3) bar on appeals of guilty pleas. In the final manifestation of the rule, this language was stricken. The value of preserving an issue for a prohibited appeal remains to be seen.

4A B. John Burns, *Iowa Practice Series: Criminal Procedure* § 12:3 n.105 (Mar. 2024) [hereinafter *Criminal Procedure*].

following a guilty plea, to include a jurisdictional statement establishing "grounds that establish 'good cause' for purposes of Iowa Code section 814.6(1)(a)(3)"). Recognizing that the "interest of justice" is undefined in chapter 814, Scullark asks us to adopt this common meaning: "the proper view of what is fair and right in a matter in which the decision-maker has been granted discretion." *Interests of Justice*, *Black's Law Dictionary* (11th ed. 2019). From there, Scullark argues that fairness favors appellate adjudication for three reasons: (1) correct resolution of this constitutional question is valuable not only to him "but to all Iowans"; (2) he has no other avenue for relief; and (3) review would serve "the general purpose" of "good cause" under the statutory scheme. *See State v. Treptow*, 960 N.W.2d 98, 109 (Iowa 2021) (describing "good cause" as "a legally sufficient reason" which in turn means "a reason that would allow a court to provide some relief").

We agree that adjudication of the suppression issue is in the interest of justice.[5] Reviewing this contested constitutional claim—whether the officer acted legally in conducting the warrantless search of Scullark's fanny pack—fulfills the quintessential purpose of the newly enacted scheme of conditional guilty pleas. Because it is "fair and right" that we decide the reserved issue, we have jurisdiction to proceed. *See Criminal Procedure* § 12:3 n.105 ("The 'interest of justice' finding must be the good cause standard for permitting the appeal of a conditional plea to go ahead.").

---

[5] In its appellee's brief, the State notes that Scullark is appealing from a conditional guilty plea but does not contest our jurisdiction to adjudicate the suppression issue. *See* Iowa R. App. P. 6.103(2)(b) (stating if appellee is dissatisfied with appellant's jurisdictional statement, it may include its own jurisdictional statement in its brief or may move to dismiss for lack of good cause). From its lack of response, we presume that the State is satisfied with Scullark's jurisdictional statement.

### III. Scope and Standards of Review

This appeal involves the constitutional right to be free from unreasonable searches and seizures. Thus, we review the suppression ruling de novo. *State v. Gaskins*, 866 N.W.2d 1, 5 (Iowa 2015). That standard means that we independently evaluate "the totality of the circumstances as shown by the entire record." *State v. Baker*, 925 N.W.2d 602, 609 (Iowa 2019) (citation omitted). "We give deference to the district court's factual findings, but they do not bind us." *Id.*

Scullark contests the warrantless search of his fanny pack under the federal and state constitutions. *See* U.S. Const. amend. IV; Iowa Const. art. I, § 8. The district court decided to "analyze the search of the fanny pack under both of those constitutions as one" asserting that the defense did not provide "any argument or basis to distinguish between the federal and state constitution as it pertains to these particular protections." On appeal, Scullark challenges that assertion, insisting his trial attorney did distinguish between precedent decided under the state constitution, *see Gaskins*, 866 N.W.2d at 14, and federal caselaw, *see Arizona v. Gant*, 556 U.S. 332 (2009). We agree that Scullark raised article I, section 8 as an independent ground for relief in the suppression proceedings. So, as appropriate, we may apply a different standard to his claims under the Iowa Constitution. *See State v. Vance,* 790 N.W.2d 775, 789 (Iowa 2010) (declining to "blindly follow federal precedent on issues of Iowa constitutional law").

### IV. Analysis

A search conducted without prior judicial approval is per se unreasonable unless the State can show that a recognized exception to the warrant requirement applies. *Gaskins*, 866 N.W.2d at 7. Here, the State relies on the exception for

searches incident to arrest. That exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant,* 556 U.S. at 338; *accord Gaskins*, 866 N.W.2d at 8. "The search-incident-to-arrest exception to the warrant requirement must be narrowly construed and limited to accommodating only those interests it was created to serve." *State v. McGrane*, 733 N.W.2d 671, 677 (Iowa 2007).

More than four decades ago, the United States Supreme Court articulated the twin rationales for allowing police to search incident to arrest:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

*Chimel v. California*, 395 U.S. 752, 762–63 (1969).

But *Chimel* did not limit the scope to the arrestee's person:

> And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Id.* at 763.

In upholding the search of Scullark's fanny pack, which he was wearing just before his arrest, the district court cited *Chimel*, as well as two of our unpublished cases: *State v. Jones,* No. 02-1972, 2003 WL 22699655 (Iowa Ct. App. Nov. 17, 2003) and *State v. Allen,* No. 06-1770, 2007 WL 2964316 (Iowa Ct. App. Oct. 12,

2007). We start with those now-dated cases. More than twenty years ago, our court upheld the search of a backpack that officers removed from Jones as he was resisting arrest. *Jones*, 2003 WL 22699655, at *1. We reasoned that the right to search incident to arrest continued even if the backpack were no longer accessible to Jones at the time of the search—as long as it was within his reach at the time of his arrest. *Id.*

Using the same rationale, we upheld the search of a backpack sitting on the floor next to Allen when he was arrested. *Allen*, 2007 WL 2964316, at *4 (relying on automobile-search case, *New York v. Belton*, 453 U.S. 454 (1981)). *Belton* allowed the search of containers within a motorist's reach at the time of the arrest, and defined a container as any object that held another object, including those located within the passenger compartment of the automobile. 453 U.S. at 460 n.4.

The trouble with the district court's reliance on *Jones* and *Allen* is that those cases predate the recasting of *Belton* in *Gant*. In that 2009 decision, the supreme court declined "[t]o read *Belton* as authorizing a vehicle search incident to every recent occupant's arrest" and warned that such a broad interpretation would "untether the rule from the justifications underlying the *Chimel* exception." *Gant*, 556 U.S. at 343. *Gant* held that, under the *Chimel* rationale, police could search a vehicle incident to a recent occupant's arrest *only* when the arrestee was "unsecured and within reaching distance of the passenger compartment at the time of the search."[6] *Id.* And that was not Gant's situation. "Unlike in *Belton*, which

---

[6] *Gant* also included a second holding that did not flow from *Chimel*. The Court concluded that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Gant*, 556 U.S. at 343 (quoting

involved a single officer confronted with four unsecured arrestees, the five officers in this case outnumbered the three arrestees, all of whom had been handcuffed and secured in separate patrol cars before the officers searched Gant's car." *Id.* at 344. As its bottom line, *Gant* rejected the notion that searches incident to arrest were reasonable regardless of "the possibility of access" in any case. *Id.* And "the most important characteristic of *Gant*'s 'possibility of access' rule is that it is to be applied 'at the time of the search' rather than at some earlier time." 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7.1(c) (6th ed. 2024).

Our supreme court discussed *Gant* at length in *Gaskins*. 866 N.W.2d at 11−14. After doing so, it held that opening a locked safe in Gaskin's vehicle was not a valid search incident to arrest. *Id.* at 14. *Gaskins* rejected the *Belton* rule that authorized warrantless searches of containers regardless of the *Chimel* considerations of officer safety and protecting evidence. *Id.* at 12. Instead, the court sided with jurisdictions that viewed the search-incident-to-arrest exception as "a rule of reasonableness anchored in the specific circumstances facing an officer." *See State v. Rowell*, 188 P.3d 95, 101 (N.M. 2008); *accord Gaskins*, 866 N.W.2d at 12–13 (citing *Rowell*, 188 P.3d at 101 (refusing to draw "artificial lines" unrelated to the *Chimel* rationales), and *State v. Valdez*, 224 P.3d 751, 758–59 (Wash. 2009) ("The search incident to arrest exception, born of the common law, arises from the necessity to provide for officer safety and the preservation of evidence of the crime

---

*Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)). In *Gaskins*, our supreme court rejected that evidence-gathering purpose of the search-incident-to-arrest exception under the Iowa Constitution. 866 N.W.2d at 13. The evidence-gathering rationale is not at issue here.

of arrest, and the application and scope of that exception must be so grounded and so limited.")). In the end, the Iowa Supreme Court approved *Gant*'s "reaching distance" rationale "as an appropriate limitation on the scope of searches incident to arrest under article I, section 8 of the Iowa Constitution because that limitation is faithful to the underlying justifications for warrantless searches incident to arrest." *Gaskins*, 866 N.W.2d at 13.

Returning to *Jones*, before *Gant* and *Gaskins*, our court said: "[W]e have considered the following facts cited by Jones: 1) at least four police officers were at the scene of the arrest, 2) Jones was handcuffed, and 3) Jones was in the squad car at the time of the search. These facts do not mandate a different result." 2003 WL 22699655, at *1. After *Gant* and *Gaskins*, those facts would mandate a different result. Because Jones was neither unsecured nor within reaching distance of his backpack at the time of the search, the police intrusion was untethered from the justifications underlying the *Chimel* exception. *See Gant*, 556 U.S. at 343. The same holds true in Allen's case. Police did not search his backpack until they "gained control" of him and placed him in the patrol car. *Allen*, 2007 WL 2964316, at *4.

With the restrictive reading of *Belton* in *Gant* and *Gaskins*, we must rethink the decisions in *Jones* and *Allen*. Commentators agree that the exception has narrowed. *See* 3A Charles Allen Wright, Arthur R. Miller, & Sarah N. Welling, *Fed. Prac. and Proc.* § 676 (4th ed. 2024) ("The appellate courts have generally applied this test to allow police to search within the defendant's grab area even when the defendant's literal ability to grab is limited by guards or handcuffs, but this authority

may be curtailed in the wake of the 2009 case, *Arizona v. Gant*, which limited searches incident to arrest in the context of automobiles." (footnotes omitted)).

But does *Gant* apply outside the vehicle context? Justice Alito thought so, writing: "there is no logical reason why the same rule should not apply to all arrestees." *Gant*, 556 U.S. at 364 (Alito, J., dissenting). And many federal and state courts view *Gant* as imposing limits on any search incident to arrest. *See, e.g.*, *United States v. Davis*, 997 F.3d 191, 198 (4th Cir. 2021) (rejecting search-incident-to-arrest justification because Davis was "handcuffed and face-down" and "not within reaching distance of the backpack next to him"); *United States v. Knapp,* 917 F.3d 1161, 1169 (10th Cir. 2019) (finding search of purse was invalid as incident to arrest because "not only were Ms. Knapp's hands cuffed behind her back, Officer Foutch was next to her, and two other officers were nearby. Moreover, the purse was closed and three to four feet behind her, and officers had maintained exclusive possession of it since placing her in handcuffs"); *United States v. Stanek*, 536 F. Supp. 3d 725, 740 (D. Haw. 2021) ("There was no threat that Stanek could have broken free and accessed his bag, and the Government has never asserted that Stanek could have destroyed evidence stored in the bag or pulled a weapon out of it."); *United States v. Moffitt*, No. 2:22-cv-00067, 2023 WL 4197110, at *6 (D. Vt. June 27, 2023) (finding government did not prove search-incident-to-arrest exception because "[w]hen the fanny pack was briefly opened and visually searched, [Moffitt] was handcuffed, in the process of being ankle cuffed, and was surrounded by law enforcement officers"); *United States v. Williams*, No. 2:19-cv-401, 2020 WL 4341722, at *11 (N.D. Ala. June 10, 2020) ("Once the officers took possession of the bag, handcuffed Williams, and had

13

begun to lead him away from the bag, there is no basis for concluding that the bag remained within Williams grab area."); *United States v. Morillo*, No. 08-cr-676, 2009 WL 3254429, at *13 (E.D.N.Y. Aug. 12, 2009) (rejecting search-incident-to-arrest exception because "officers credibly testified that [Morillo] had been handcuffed and placed up against the back passenger side of the police car, while they conducted a search of his backpack at the rear of the vehicle"); *Jean v. State*, 369 So. 3d 1235, 1240–41 (Fla. Dist. Ct. App. 2023) (finding that after officers removed backpack and fanny pack from Jean and placed them on hood of patrol car, a search based on officer safety or destruction of evidence was no longer justified); *State v. Ortiz*, 539 P.3d 262, 268 (N.M. 2023) (denying search-incident-to-arrest exception when officer searched defendant's purse after she "had been arrested and was in handcuffs"); *State v. Lelm*, 962 N.W.2d 419, 424 (N.D. 2021) (finding search-incident-to-arrest exception did not apply because "[o]nce detained, Lelm's backpack was no longer within his reach").

Turning back to Iowa authority, even before *Gant* and *Gaskins*, our supreme court recognized that outside the context of vehicle searches, a search could be justified only as incident to arrest when it was conducted in an "area into which an arrestee might reach in order to grab a weapon or evidentiary items." *See State v. Canas*, 597 N.W.2d 488, 493 (Iowa 1999), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601 (Iowa 2001) (quoting *Chimel*, 395 U.S. at 763). Canas was standing about four feet from an unzipped bag on a nightstand in his hotel room when he was arrested. *Id.* at 491. But because he was not in the motel room when the officers searched the bag, their conduct was not permitted under the incident-to-arrest exception. *Id.* at 493. Like Canas, Scullark was separated from

his fanny pack when police searched it. His fanny pack was no longer in an area "into which an arrestee might reach in order to grab a weapon or evidentiary items." *See id.* (quoting *Chimel,* 395 U.S. at 763).

Having shown that *Gant* and *Gaskins*—as well as *Canas*—limit the scope of the search-incident-to-arrest exception, we still must tie up a couple loose ends. Beyond *Jones* and *Allen*, the district court relied on a third unpublished case: *State v. Saxton,* No. 14-0124, 2014 WL 7343522 (Iowa Ct. App. Dec. 24, 2014). There, our court approved the search of a backpack that was in Saxton's immediate possession when he was arrested. *Id.* at *2. We held: "The fact that he ran and was not subdued until he had put a distance between his person and the backpack is not material as long as the search was contemporaneous with the arrest." *Id.* Scullark argues that because *Saxton* predated *Gaskins*, it would come out differently today. He contends: "Accessibility, not merely contemporaneity, is the defining characteristic of the search incident to arrest exception under the Iowa Constitution."

The State responds that the supreme court denied further review in *Saxton* after deciding *Gaskins*. And adds that *Gaskins* "did not change the analysis for searches incident to arrest when the purpose is officer safety or the prevention of the destruction of evidence."[7] *See Gaskins,* 866 N.W.2d at 15. The first response makes no difference because denial of further review has no precedential value. *See* Iowa Ct. R. 21.27(3). The State's second point is true as far as it goes. But

---

[7] The State does not argue that Scullark's fanny pack was part of his "person" and could be searched just as the pockets of his clothing. *See Knapp,* 917 F.3d at 1166−67 (discussing *United States v. Robinson*, 414 U.S. 218 (1973)).

nothing in our record shows that the search of Scullark's fanny pack was necessary for their safety or to prevent him from destroying evidence of the assault.

What the record does show is that Officer Bolstad believed from the start that he was entitled to search the fanny pack because he was making an arrest, telling Scullark as he handcuffed him that everything that he was passing to his friend would be inspected. But the notion of police entitlement to search someone's nearby personal effects whenever they execute an arrest has been debunked by the United States Supreme Court. First by Justice Scalia in his special concurrence in *Thornton v. United States*:

> [C]onducting a *Chimel* search is not the Government's right; it is an exception—justified by necessity—to a rule that would otherwise render the search unlawful. If "sensible police procedures" require that suspects be handcuffed and put in squad cars, then police should handcuff suspects, put them in squad cars, and not conduct the search. Indeed, if an officer leaves a suspect unrestrained nearby just to manufacture authority to search, one could argue that the search is unreasonable *precisely because* the dangerous conditions justifying it existed only by virtue of the officer's failure to follow sensible procedures.

541 U.S. at 627 (Scalia, J., concurring).

And then by Justice Stevens in *Gant*:

> The fact that the law enforcement community may view the State's version of the *Belton* rule as an entitlement does not establish the sort of reliance interest that could outweigh the countervailing interest that all individuals share in having their constitutional rights fully protected. If it is clear that a practice is unlawful, individuals' interest in its discontinuance clearly outweighs any law enforcement "entitlement" to its persistence.

556 U.S. at 349.

As its final defense of the suppression ruling, the State points to *State v. Schiebout,* No. 18-1662, 2019 WL 4309062 (Iowa Ct. App. Sept. 11, 2019), a post-

*Gaskins* decision in which our court upheld the warrantless seizure of an arrestee's purse. But *Schiebout* is distinguishable from this case. While being arrested on an outstanding warrant, Schiebout abandoned her purse on the ground outside a church. *Id.* at *1. Finding that suspicious, police seized the purse. *Id.* Schiebout then "grabbed the purse" from the deputy and gave it to her mother. *Id.* "The deputy responded by taking the purse away from Schiebout's mother." *Id.* Our court found the purse was accessible to Schiebout at the time of the deputy's seizure "as demonstrated by her ability to grab the purse and hand it to her mother." *Id.* at *2. We viewed Schiebout's conduct as exemplifying the need to seize the purse incident to her arrest to preserve evidence. *Id.* Notably, the deputy did not search Schiebout's purse after placing her in the patrol car. Instead, he transported it to the sheriff's office where a drug-sniffing dog indicated the purse contained illegal drugs. *Id.* at *1. "The deputy then sought and obtained a search warrant for the purse. The subsequent search revealed several individual baggies of methamphetamine." *Id.*

By contrast, when police seized Scullark's fanny pack, he was already in handcuffs and—by the officer's admission—could not reach the pack or its contents.[8] And not only did police seize the fanny pack, put they went ahead and

---

[8] The Tenth Circuit adopted a four-factor test to determine the propriety of a search incident to arrest: "(1) whether the arrestee is handcuffed; (2) the relative number of arrestees and officers present; (3) the relative positions of the arrestees, officers, and the place to be searched; and (4) the ease or difficulty with which the arrestee could gain access to the searched area." *Knapp*, 917 F.3d at 1168–69. The court added: "the degree to which arresting officers have separated an article from an arrestee at the time of the search is an important consideration." *Id.* at 1169. Applying these criteria, the search of Scullark's fanny pack was not valid incident to his arrest.

searched it outside the patrol car without a warrant. As in *Gaskins*, the safety of the officers was not endangered by the contents of an item that the arrestee could not realistically access. *See* 866 N.W.2d at 14. On this record, we find that the State failed to prove the warrantless search was reasonable. Thus, we reverse the suppression order and remand for further proceedings.

**REVERSED AND REMANDED.**

Badding, J., concurs; Buller, J., dissents.

**BULLER, Judge** (dissenting).

Unlike the majority, I would not voyage into uncharted waters and resolve the issue related to construction of Iowa Code section 814.6(3) (2023), nor would I depart from existing case law to establish a new limitation on searches incident to arrest. I would instead decide only the questions before us, in a narrow way consistent with our unpublished cases, and leave for another day the new code provision's meaning or the constitutional search question that—contrary to the impression one may gather from the majority opinion—has sharply divided courts. Because I believe the search finding methamphetamine in the defendant's fanny pack was constitutionally reasonable, I dissent from the reasoning and outcome of the majority opinion.

First, I do not join the majority's analysis on the meaning of "appellate adjudication of the reserved issue is in the interest of justice" in Iowa Code section 814.6(3). This is an issue of first impression before both this court and the supreme court. In his brief, Scullark offers a proposed construction of the statute that serves him. The State did not meaningfully address the issue in its brief, which I interpret as a concession that resolution of this particular conditional-guilty-plea appeal is in the interest of justice rather than wholesale agreement with the defendant's reading of the statute. I would accept the State's concession and go no further, finding this case satisfied the jurisdictional prerequisite of section 814.6(3). And I note this was the approach taken by a unanimous panel of our court in another case decided earlier this month. *See State v. Sampson*, No. 23-1348, 2024 WL 3688526, at *1 n.2 (Iowa Ct. App. Aug. 7, 2024). I reject

the majority's proposed gloss on the statute and reserve judgment on that issue until presented with full briefing from both sides.

Second, I would not discard our unpublished cases as the majority does, nor would I set off in a new direction based on out-of-state authorities regarding searches incident to arrest. In expanding *Gant* beyond the context of automobile searches, and thus adopting a time-of-search rather than time-of-arrest rule, the majority reaches beyond the briefs to decide another issue of first impression in Iowa. And it does so by picking and choosing which precedent to follow—relying on a *Gant* dissent and a one-sided smattering of authorities from other jurisdictions.

For me, the dispositive United States Supreme Court precedent is one the majority relegates to a parenthetical citation in a footnote: *United States v. Robinson*, 414 U.S. 218 (1973). There, the Supreme Court upheld a warrantless search of a cigarette pack even though the police had already taken the pack from the arrestee and thereby limited or eliminated his ability to access it at the time of the search. *Id.* at 235. The Court reasoned: "The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." *Id.* at 234. Thus "[i]t is the fact of the lawful arrest which establishes the authority to search," and such a search is reasonable under the Fourth Amendment. *Id.* at 235.

There is no question *Robinson* remains good law. It was discussed at length in *Riley v. California*, where the Court described its holding in *Robinson* as "conclud[ing] that the search of Robinson was reasonable even though there was

no concern about the loss of evidence, and the arresting officer had no specific concern that Robinson might be armed." 573 U.S. 373, 384 (2014) (noting the *Robinson* "exception was limited to personal property immediately associated with the person of the arrestee" (cleaned up)). The Court, after exempting cell phones from searches incident to arrest, observed *Robinson*'s "categorical rule" otherwise "strikes the appropriate balance in the context of physical objects." 573 U.S. at 386. And two years later in *Birchfield v. North Dakota*, the Court again reiterated the rule from *Robinson* and noted *Riley* "reaffirmed . . . and explained how the rule should be applied." 579 U.S. 438, 460 (2016) ("In *Robinson* itself, [the fact of lawful arrest] meant that police had acted permissibly in searching inside a package of cigarettes found on the man they arrested."). In my view, *Robinson*'s categorical rule controls and this is an easy case.

Until now, our unpublished case law agreed with my assessment. *See State v. Schiebout*, No. 18-1662, 2019 WL 4309062, at *2–3 (Iowa Ct. App. Sept. 11, 2019); *State v. Saxton*, No. 14-0124, 2014 WL 7343522, at *3 (Iowa Ct. App. Dec. 24, 2014); *State v. Allen*, No. 06-1770, 2007 WL 2964316, at *3 (Iowa Ct. App. Oct. 12, 2007); *State v. Jones*, No. 02-1972, 2003 WL 22699655, at *1 (Iowa Ct. App. Nov. 17, 2003). In twisting past these on-point decisions, the majority points to *State v. Canas*, 597 N.W.2d 488 (Iowa 1999). But not convincingly. *Canas* only supports the majority opinion if you ignore the facts. Police arrested Canas outside a hotel room, and the supreme court unsurprisingly concluded the officers could not later enter the room and search it without a warrant. 597 N.W.2d at 491, 493. It is, of course, black-letter United States Supreme Court law that police may not enter a residence to conduct a warrantless

search when an arrest is made outside the home. *See Vale v. Louisiana*, 399 U.S. 30, 33–34 (1970) ("If a search of a house is to be upheld as incident to an arrest, that arrest must take place inside the house[.]"). And our supreme court expressly cited *Vale* for this proposition in *Canas*, 597 N.W.2d at 493. I think it's beyond reasonable debate that *Canas* regulates arrests outside a residence, not searches of containers on or near a person—and the leading treatise supports my reading. *See* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.3 n.1 (6th ed. 2024) [hereinafter "LaFave"]. With our unpublished cases universally coming out the other way, and *Canas*'s facts inapposite at best, the majority scraps existing case law and invokes out-of-state authorities to fashion a new-to-Iowa limitation on searches incident to arrest. I strongly disagree with this endeavor.

This departure from the fact-bound analysis in our unpublished cases unnecessarily launches us into the middle of a nationwide dispute over whether the search-incident-to-arrest analysis should turn on whether the searched container is accessible to the arrestee at the time of the arrest or the time of the search. In other words, is the scope of searches incident to arrest subject to a "time-of-arrest" or "time-of-search" limitation?

In answering this question, the majority opinion gives a lopsided and incomplete recitation of where other courts have landed. While there is some authority that supports the majority's position, the majority opinion curiously omits from discussion the equal or greater number of state and federal appellate courts that have expressly come out the other way and held that a container in the arrestee's possession at the time of arrest may be searched without a warrant,

regardless of whether the arrestee could access the container at the time of the search. *See, e.g.*, *Commonwealth v. Bembury*, 677 S.W.3d 385, 406 (Ky. 2023) ("[W]e conclude that a container capable of carrying items, such as a backpack, can be considered part of an arrestee's 'person' for the purposes of a search incident to lawful arrest."), *cert. denied sub nom. Bembury v. Kentucky*, 144 S. Ct. 1459 (2024)[9]; *United States v. Perez*, 89 F.4th 247, 261 (1st Cir. 2023) (re-affirming as law of the circuit that the search of "personal property carried by an arrestee at the time of the arrest" is permissible per *United States v. Eatherton*, 519 F.2d 603, 610 (1st Cir. 1975) (affirming search of a briefcase incident to arrest even though the arrestee "had been subdued and the case removed from his possession and beyond his possible reach")); *Price v. State*, 662 S.W.3d 428, 438 (Tex. Crim. App. 2020) (adopting a time-of-arrest rule, at least for containers in the arrestee's immediate possession that would inevitably be taken to the stationhouse upon arrest); *State v. Brownlee*, 461 P.3d 1015, 1021–22 (Or. Ct. App. 2020) (taking a time-of-arrest approach and expanding the scope of the search incident to items possessed at the time of arrest and items or area "immediately associated with the arrestee at that time"); *Greene v. State*, 585 S.W.3d 800, 806–08 (Mo. 2019) (rejecting expansion of *Gant* beyond automobiles, applying *Robinson* and its progeny to affirm "a reasonably delayed search of items found on a

---

[9] The defendant in *Bembury* petitioned for certiorari on this very issue. The petition described the time-of-arrest vs. time-of-search issue as concerning "a deep split among federal and state lower courts." Petition for Writ of Certiorari, *Bembury v. Kentucky*, No. 23-802 (2024), 2024 WL 305621, at *11, *13–24. Kentucky's brief in opposition acknowledged the divide among courts but urged that case did "not cleanly contribute to [the] split." Brief in Opposition, *Bembury v. Kentucky*, No. 23-802 (2024), 2024 WL 1421514, at *23.

defendant's person at the time of arrest"—specifically a cigarette pack); *United States v. McLaughlin*, 739 F. App'x 270, 275–76 (5th Cir. 2018) (affirming search of envelope on defendant's person at time of arrest, even though defendant could not access envelope after he was "handcuffed and beyond reaching distance"); *State v. Mercier*, 883 N.W.2d 478, 493 (N.D. 2016) ("Because Mercier had the backpack in his actual possession immediately preceding his lawful arrest, we conclude a search thereof was reasonable.")[10]; *People v. Cregan*, 10 N.E.3d 1196, 1203–07 (Ill. 2014) (holding objects and containers physically possessed by arrestees at the time of arrest are subject to search incident to arrest); *State v. Adams*, 45 N.E.3d 127, 159 (Ohio 2015) ("[T]he right to search incident to arrest exists even if the item is no longer accessible to the arrestee at the time of the search. As long as the arrestee has the item within his immediate control near the time of the arrest, the item can be searched." (citation omitted)); *State v. Byrd*, 310 P.3d 793, 798 (Wash. 2013) (surveying in-state cases and noting, "Washington courts have long applied this [time-of-arrest] rule, holding that searches of purses, jackets, and bags in the arrestee's possession at the time of arrest are lawful under both the Fourth Amendment and article I, section 7 [of the Washington Constitution]."); *People v. Marshall*, 289 P.3d 27, 31 (Colo. 2012) (rejecting expanding *Gant* to searches of a person and holding, in the context of a backpack possessed at the time of arrest but not searched until the defendant was

---

[10] The majority cites a different North Dakota case: *State v. Lelm*, 962 N.W.2d 419 (N.D. 2021). But *Lelm* involved search of a bag inside an automobile and thus implicated *Gant. Id.* at 422 (noting Lelm was a passenger and the backpack was "on his lap" while inside the car). This case concerns search of a person and his effects—not an automobile. And *Lelm* did not purport to overrule *Mercier,* which remains the applicable North Dakota authority.

secured inside a patrol vehicle, "[t]hat [the defendant] was secure has no bearing on the analysis in this case because [the defendant] forfeited his expectation of privacy in the backpack when he was arrested"); *United States v. Perdoma*, 621 F.3d 745, 750–53 (8th Cir. 2010) (affirming search incident to arrest of a bag after the defendant was handcuffed and an officer "had taken control of the bag," when the bag remained in the vicinity of where the defendant was arrested).

These cases largely speak for themselves, but a few highlights stick out:

- **From an originalist or historical perspective, it seems clear the Framers would have no constitutional concerns over a search incident to arrest of "luggage" or "saddlebags" in a person's possession.** *E.g.*, *Price*, 662 S.W.3d at 435 (citing *Birchfield*'s discussion of the Fourth Amendment's original meaning); *Mercier*, 883 N.W.2d at 487–88 (same).

- **The time-of-arrest rule follows logically from *Robinson* and is consistent with all existing United States Supreme Court precedent.** *E.g.*, *Bembury*, 677 S.W.3d at 404–06; *Mercier*, 883 N.W.2d at 488–89; *Cregan*, 10 N.E.3d at 1202–03; *Marshall*, 290 P.3d at 29–30.

- **The best reading of *Gant* is that it does not extend beyond automobiles to the search incident to arrest of a person and his or her effects**. *E.g.*, *Mercier*, 883 N.W.2d at 489 ("Nothing in the Court's opinion in *Gant,* however, suggested it was meant to limit or abrogate the *Robinson* holding of a search of the arrestee incident to arrest."), 490 ("Because the Supreme Court's decision in *Gant* does not restrict the lawful search of an arrestee, there is no requirement that the arrestee be within reaching distance or have the item within his immediate control once it is seized as part of the lawful arrest."); *Cregan*, 10 N.E.3d at 1202 (rejecting a "broad" reading of *Gant* and noting it only "clarified and limited the search-incident-to-arrest exception as applied to vehicles"); *Byrd*, 310 P.3d at 794 (holding *Gant* did not "restrict[ ] searches of the arrestee's person"); *Marshall*, 289 P.3d at 30 (rejecting expansion of *Gant* and noting "a factual distinction between searches of cars and persons").

- **And practical considerations support the time-of-arrest rule because it permits officers to secure suspects without drawing artificial lines between a person and their pockets or immediate possessions (which may understandably be secured in the course of an arrest to ensure officer safety).** *E.g.*, *Byrd*, 310 P.3d at 798 ("The time of arrest rule reflects the practical reality that a search of the arrestee's 'person' to remove weapons and secure evidence must include more than his literal

person[,] . . . [and] the same exigencies that justify searching an arrestee prior to placing him into custody extend not just to the arrestee's clothes, however we might define them, but to all articles closely associated with his person."); *see also* LaFave, § 5.5(a) n.4 ("The 'time of arrest' rule is a common-sense way to determine whether a container capable of carrying items, such as a backpack, is considered part of an arrestee's person and therefore subject to being searched upon lawful to arrest . . . ").[11]

It is not clear why the majority overlooks these decisions and their (in my view) convincing analysis. But an answer can perhaps be found in footnote seven of the majority opinion, where the majority claims "[t]he State does not argue that Scullark's fanny pack was part of his 'person' and could be searched just as the pockets of his clothing." This is quite a myopic and hyper-technical reading of the briefing. The State's position at the suppression hearing and on appeal was that this was a lawful search incident to arrest. This is at least as specific as Scullark's motion to suppress—which cited no case law but instead vaguely asserted the search was "in violation of the Fourth Amendment to the Constitution of the United States and article I, section 8 of the Iowa Constitution." And the rationale of this dissent is essentially the rationale adopted by the district court, drawing on our unpublished cases. Again curiously, the majority opinion has no trouble expanding the defendant's argument to embrace this issue of first impression (for example, more than half of the cases cited by the majority do not appear in either party's

---

[11] The majority cites a different portion of LaFave's treatise and claims it supports the decision to reverse here. *See* LaFave, § 7.1(c). Not so. The portion of the treatise cited by the majority comes from a chapter titled: "Search and Seizure of Vehicles." And it draws on the "quite specific" language from *Gant* regulating those who are "unsecured and within reaching distance of the passenger compartment." *Id.* (quoting *Gant*, 556 U.S. at 343). At risk of beating a dead horse to make an obvious point, this is not a vehicle case. This case is about search of a person and his personal effects. Perhaps unsurprisingly, the chapter of LaFave's treatise I cite is titled: "Seizure and Search of Persons and Personal Effects." *Id.* § 5.5(a). And it does not adopt the position claimed by the majority. *See id.*

briefs), yet it interprets the State's position and the district court ruling in an artificially narrow way. If we are going to drift beyond the briefs and start freelancing our research, we ought to at least do so in a way that is fair to all parties and the district judge whose work we are reviewing.

If forced to decide this issue of first impression, I would find the time-of-arrest authorities compelling, consistent with constitutional principles and precedent, and workable in practice. The time-of-arrest rule would require we affirm here, as even the majority acknowledges Scullark was "wearing [the] fanny pack around his waist" when arrested. For the reasons expressed in the cited authorities and United States Supreme Court case law, I believe the time-of-arrest rule is what this court or our supreme court should adopt in an appropriate case.

But I see another error in the majority's analysis, independent of the time-of-arrest and time-of-search question: the majority delves into subjective review of the arresting officer's intent and beliefs about the proper scope of the search. The majority opinion opens by quoting the officer and later opines "nothing in our record shows that the search of [the] fanny pack was necessary for [officer] safety." But, under controlling case law, these subjective case-by-case inquiries are neither permissible nor relevant. The Supreme Court in *Robinson* expressly rejected both consideration of officers' "subjective fear" that an arrestee was armed and any form of "case-by-case adjudication," instead favoring a bright-line rule. 414 U.S. at 235-36. In other words, the validity of a search incident to arrest does not depend on "the probability in a particular arrest situation that weapons or evidence [will] in fact be found." *Id.* at 235; *see also Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979) ("The constitutionality of a search incident to an arrest does not depend on

whether there is any indication that the person arrested possesses weapons or evidence."). This portion of the *Robinson* analysis, like what was discussed above, is still good law: it was discussed at length in *Birchfield*, where the Court described *Riley* as having "reaffirmed '*Robinson*'s categorical rule'" and emphasized the legality of a search incident to arrest "does not depend on whether a search of a *particular* arrestee is likely to protect officer safety or evidence." *Birchfield*, 579 U.S. at 460; *see also State v. Wissing*, 379 P.3d 413, 420–22 (Kan. Ct. App. 2016) (citing *Robinson* and *Birchfield* to reach the same conclusion). The majority errs and diverges from controlling authority when it analyzes the record contrary to these holdings.

As a policy matter, I am also troubled by implications the majority opinion will have for officer safety. The officer in this case testified he did not protest or physically interfere with Scullark handing the fanny pack to his friend because the officer "didn't want to escalate the situation because [he] was the only officer inside the residence at that time." Under the time-of-search rule, the next police officer facing the facts of this case would have to weigh escalating the use of force against potentially forfeiting a search of the container for weapons or contraband incident to arrest. In contrast, under the time-of-arrest rule, police officers are not forced to make this spit-second calculation that could potentially result in injury or loss of life and can instead rely on the bright-line categorical rule that items and containers in the suspect's possession at time of arrest are subject to search—whether the search happens before or immediately after the suspect is safely restrained and no longer an immediate threat. I also view the officer's conduct on the body camera differently than the majority, as it seems clear on my viewing that the officer

was doing his best to de-escalate a highly charged encounter in which he was the only officer in the house and nonetheless allowed Scullark's friends to surround him and engage with Scullark—even while Scullark was uncooperative. It runs counter to principles of reasonableness for us to suppress evidence because the officer chose not to escalate and use greater force during Scullark's arrest.

As a penultimate note, it is also unclear to me whether the majority grounds its decision under the state or federal constitution or perhaps both. Part of the confusion may flow from the majority's reliance on *State v. Gaskins*—which is, in my opinion, precedent of questionable vitality. *See* 866 N.W.2d 1 (Iowa 2015); *see also State v. Kilby*, 961 N.W.2d 374, 382 (Iowa 2021) (overruling a case that "relied heavily" on *Gaskins*). I do not believe *Gaskins* compels or supports the result in this case. First, *Gaskins* is easy to distinguish, as it involved search of a locked safe within the defendant's car when the defendant and his passenger were secured in a separate police vehicle—as opposed to a bag within the actual possession of a suspect or his friend. *See* 866 N.W.2d at 7–8, 14. And the *Gaskins* court specifically reserved for another day cases "in which the security of an arresting officer is implicated" or "when the arrested person is within reach of contraband and thus able to attempt to destroy or conceal it." *Id.* at 15.

But if, as the majority seems to conclude, *Gaskins* undermines federal cases like *Robinson* or requires the suppression of evidence on the facts of this case under the state constitution, it probably ought to be overruled. *Gaskins* was sharply divided and deeply fractured, with a four-justice majority, a two-justice special concurrence, a three-justice special concurrence, and two three-justice dissents. *See generally id.* As one of the *Gaskins* dissenters observed, the

rationale in that case—even more so if expanded to the facts here—"unduly restricts police searches and creates practical problems undermining public safety." *Id.* at 38 (Waterman, J., dissenting). Or, as the other dissent put it, the rule adopted by the *Gaskins* majority "compromises officer safety and creates an additional opportunity for the destruction or concealment of evidence." *Id.* at 60 (Zager, J., dissenting). In reading the *Gaskins* majority and concurrences' many pages, there is little or no textual grounding in either constitution. *See id.* at 52-53, 52 n.27 (Waterman, J., dissenting) (quoting the State's brief to comment on the text: "One expects that, if the semicolon in Article I, section 8 fundamentally altered the meaning of that provision, this argument would have emerged at some point within the first 150 years this Court interpreted the Iowa Constitution—not for the first time in 2010."). I believe *Gaskins* was wrongly decided. And while it is my duty as an intermediate appellate judge to apply supreme court precedent, I disagree with the majority that *Gaskins* supports the outcome here.

Last, a return to the facts and the issue at the heart of all this legal wrangling. Scullark was lawfully arrested with methamphetamine in a fanny pack around his waist, and he handed the pack to his friend in a bid to prevent police from finding his drugs. Both the Fourth Amendment and article I, section 8 permit reasonable searches. The majority concludes it was constitutionally unreasonable for police to secure a potentially dangerous suspect and search a fanny pack the suspect handed to his friend after the arrest. I disagree, as I believe our constitutions—to say nothing of our case law and historical practice—permit this commonsense policework.